Good morning, Your Honors, and may it please the Court. This appeal begins and ends with radical agreement. Everyone agrees NBC knowingly disclosed information that to the actual and intended recipient identified Ms. Golden as having requested or obtained specific video materials. NBC admitted it below at Joint Appendix 152. I have to interrupt right away to ask why we are not bound by our Court's prior decision in Solomon and Hughes, which the Supreme Court has denied review of, and which in Hughes you saw at panel and on bank hearing. Do you think we are not free to, do you think we are free not to follow Solomon? Absolutely, Your Honor. And why is that so? Specifically because of those four intervening decisions that say do not, and by the way Does any of those intervening decisions have anything to do with the act at question here, the Video Privacy Protection Act? No, they do not. And yet the parties agree once again. First they agree that all four prohibit atextual tests. Both sides agree on that. Is that a new rule of law, atextual tests? Is that something that the Supreme Court has never said before? I think there have been various, perhaps, threads in prior opinions, but I think Ames, Antrix, AJT, and now RICO reveal the full tapestry of no atextual tests. Were not most of those decisions that you just named, were those subject of your petition for re-hearing in Hughes? Yes, Your Honor. So our court has had an opportunity to consider their effect on the VPPA. I don't believe the denial of re-hearing is somehow a binding determination that those Supreme Court cases are not intervening and do not undermine the logic of Solomon. Our court has had an opportunity to consider those very arguments, though, that you made, right? In theory, yes. At the re-hearing stage. And the Supreme Court has rejected review. So far, that's true. Of both Solomon and Hughes. Is that correct? That is correct. And the Supreme Court has also explained countless times, as we put in a 28-J response on the Hughes point, the Supreme Court has explained countless times that the denial of certiorari does not say anything about the merits of the case. So what argument are you making today that has not previously been presented to our court? Well, I guess I would frame it a little bit differently, Your Honor. I would say... Well, I'd like to frame it the way I did. I understand. So what argument is new that you have not previously presented to this court? The argument that we're presenting has been presented in the Hughes 28-J letters and in the Hughes petition for re-hearing. That much is true. What is also true, however, is that this court has never issued an opinion that addresses our argument. What argument are you presenting today that is new? I just didn't understand. As I just said, I don't think it's new in the sense that our 28-J letters in Hughes... There is no new argument.  Right. The 28-J letters in Hughes made this argument and the petition for re-hearing made this  May I ask the question perhaps in a different way? Is it your position that there wasn't the rule of not considering a textual text before Solomon was decided? Again, I would go back to the thread and tapestry point. I think that you can pull maybe some threads of previous Supreme Court opinions that kind of hint at the rule that is fully enunciated in Ames, Antrix, AJT, and Naurica. So I think those cases more fully establish the rule that we're talking about here. Okay. If we think that Solomon is good law and that we are bound by it, are there any claims that you have that survive? If we're bound by Solomon, then I think the answer is no. If we believe that Solomon is good law and that we are bound by it, do you have any other claims that we need to be giving thought to? No. Our case is about whether the Supreme Court's admitted prohibition on atextual tests undermines the logic of Solomon, which flatly imposes an atextual test, an ordinary person test that is nowhere mentioned in the statute, that Solomon itself said went beyond the statutory text, that Solomon itself said excluded the kind of information the definition encompasses that conflicts with Salazar in various ways. And I want, just with my remaining time, Your Honors, I want to talk about the fact that our case actually doesn't even involve an ambiguity. Our case meets the statutory definition right in the heartland, and I want to drive home that point with a hypothetical really quickly. Imagine a hypothetical law that refers to dogs, cats, and other animals. If a particular case concerns an alligator, that law probably has some ambiguity. The text, you know, the answer isn't exactly clear from the text alone. It looks like a list of household pets. There might be other textual clues pointing in either direction. The court has something to resolve. But that's not our case. If everyone agrees the case involves a black lab, there's no ambiguity in that statute. The law plainly includes dogs, without limitation, without exception. Are you asking us to adopt a rule that courts should always adopt the most expansive possible definition of an unclear statutory term? Absolutely not, Your Honor. Okay, so how is that different than your hypothetical? Well, what I'm saying is everyone agrees on both sides that this information did identify Ms. Golden as having requested or obtained specific video materials. It's like saying we're the black lab in the dog case. It's not expansive. It's not expanding anything in the text. The only thing our rule would require is that courts not read in a limitation or an additional requirement on top of the statutory text. And that's, again, exactly what Ames, Antrix, AJT, and Rico said. And was there an argument made in Solomon that, hey, you can't, of course this meets the definition because of personal identity. I have no information because that's what the statute says. And you can't add other requirements that aren't there in the statute. Unfortunately, Your Honor, I think the exact opposite argument was made. In Solomon, if you look at that opinion, it lays out the party's arguments. And on one side, a party was championing the ordinary person test that the court ended up adopting. On the other side, though, the other party was championing the reasonable foreseeability test. Both of those tests are atextual. And that, again, suggests, I think, that this rule against atextual tests is something new. Both parties were proposing atextual tests. The court adopted one of those atextual tests, probably confined by the party's agreements to some extent, and never addressed any prior decision from the Supreme Court or elsewhere that forbade the imposition of atextual tests. There's no question here Solomon's test is atextual. Both parties agree the Supreme Court forbids atextual tests. This court should reverse. Thank you. Thank you. We'll hear from you again in a few minutes. And now we'll hear from Attorney Thomason. Good morning, Your Honors. Your Honors, may it please the Court, Ben Thomason for Defendant Apolli, NBC Universal Media. Your Honor, as you noted, this case should be exceedingly straightforward. There's no dispute here that when this court issued its decision in Solomon v. Flips Media, it addressed the statutory term, personally identifiable information in the Video Privacy Protection Act for the first time, and established binding circuit precedent. Well, so I'm asking, is your view that Solomon forecloses any VPAA claim based on Facebook Pixel? It's an interesting question, Your Honor. It certainly precludes this Facebook Pixel claim because the facts alleged here are specifically identical in the material way to those addressed in this by the Solomon panel and by the- Okay, but you're not asking us to go so far as to say that there's no claim that could be raised with respect to Facebook Pixel and the VPAA? Well, this court in the Hughes decision, the summary opinion, did effectively state just that because what the facts alleged in Solomon showed and what the facts- Okay, you're not asking us to rule that way today, though. You don't think we need to go that far for you to prevail, is that correct? Of course not, because what, and I think this goes exactly to what counsel was just talking about and talks about on his theory of appeal, right? If we go to the Ames decision and we go to Justice Thomas' concurrence where he talks about atextual rules and frameworks, we can go right to his citation to the 1988 decision from Justice Scalia, the dissent, where Justice Scalia identifies the difference between what Article III allows. Courts are allowed to interpret statutes and apply that interpretation to the facts before it, but they are not allowed to make substantive law, right? And when Justice Thomas talks about atextual frameworks, he's talking about the same thing, and it's not the first time that he's brought up this point, even as specific as he did in the Ames concurrence. In 2019, Justice Thomas used the term atextual judicial supplementation to identify the same problem that connects Ames, Antrix, and AJT, and in that decision, which is Rakisky versus Clem, 589 U.S. 8, he referred to that issue as a foundational problem of statutory interpretation. It has been around for decades, since the beginning. And to go directly to Your Honor's point, this court is presented with a set of facts. It is bound to apply binding circuit precedent to those set of facts, exactly. But we do have the opportunity to consider whether or not something has been abrogated, and we have our own court mechanisms for trying to ascertain whether we all agree that it has been. So why don't you explain why you do not think those cases abrogate Solomon? Sure. I think there's two sources you can go for that. First of all, as Your Honor noted, this question has already been presented to the court, and it's already been weighed upon. And Hughes, the same counsel present here today, presented these exact same arguments addressing Ames, Antrix, and AJT, said that in those decisions, the Supreme Court presented a new interpretive framework that courts must follow, and that conflicted with the Solomon decision, and therefore asked the court to reconsider en banc its decision in Hughes. A majority of judges on the Second Circuit declined that invitation. So they've already been presented with this argument, and they have declined to entertain it in a way that would lead to the abrogation of Solomon. Although lots of, I mean, there's no significance to whether we grant or deny rehearing en banc, right? There are lots of reasons to do that, even if we agree with the arguments that are made, we might deny rehearing en banc for other reasons. Well, Your Honor, I think there is significance, but you don't have to rely entirely on that. We can go actually to what the Supreme Court cases cited by counsel say, right? So if we look at what connects Ames, AJT, and Antrix, at a very high level, it's that it's all articulated by Justice Scalia, and articulated by Justice Thomas. It's that courts are empowered to interpret statutes, but they're not empowered to make some law. They can't add elements to statutes, they can't add burdens to a primary case. And that is, at a very high level, what was at issue at each of these cases, right? In Ames, we have the Supreme Court addressing a Sixth Circuit rule that required certain Title VII plaintiffs to satisfy an additional burden at the first phase of the McDonnell-Douglas burden-shifting framework. In Antrix, we have the Supreme Court rejecting a Ninth Circuit precedent that required three elements to establish personal jurisdiction in Section 1330 of the Foreign Sovereign Immunities Act, when that provision only had two elements. And then in AJT, we have the Supreme Court rejecting an Eighth Circuit precedent, which required certain ADA and Rehabilitation Act claimants to show an additional element at the first phase of their case as well. What connects all these cases is, again, the fact not that the judges were interpreting statutes, or were interpreting statutes in a way where there's disagreement between other circuit courts or anything of the nature, they were adding to what the statutes require. And if we go directly to the Solomon decision, we can see that that is not what the court was doing. Solomon is an interpretive decision. It identifies a single statutory term, personally identifiable information, and then as it's done numerous times in other statutory interpretation cases, it looks at the plain language of the statute, it looks at that language in context, and then it looks at it in context of the statute as a whole. And to this end, the court was doing the exact same task that the First Circuit did in Earshoff, that the Third Circuit did in In re Nickelodeon, and that the Ninth Circuit did in Eichenberger. All four circuit court decisions have that same goal, interpreting this phrase, personally identifiable information, which almost every court to examine that language has agreed is not definite. It was... Oh, sorry. Can I ask a modified version of my colleague's question? The Solomon court established an interpretive rule of law that personally identifiable by whom, by ordinary person. That's the legal focus of today's argument. But it also applied that test to the record, and it concluded that the ordinary person couldn't discern personal information based on this little string of code. What if a well-developed record in a future case reflected that an ordinary person under the age of 35 could absolutely look at that string of code and immediately know, by checking the Facebook ID and figuring out the Facebook account, and then matching it to the URL of the code, that exactly who it was and what they were watching. Would we be free in that case to look at that factual change, a change in the record as to how this rule of law applies, even applying the rule of law that they established, to revisit that in the context of that kind of record? It's... Well, first of all, that record is not presented here. No, I'm... No, I'm just trying to understand the scope of what we are and aren't bound by Solomon and what does and doesn't constitute the kind of change that would allow us to revisit its conclusions. Right. I mean, it's an interesting question, Your Honor. So obviously what this appeal is about is whether or not there was intervening Supreme Court authority that articulated a new rule of interpretive law. And as we've all discussed today, I think that plainly did not happen. This was a foundational rule that does not provide cause to revisit Solomon, much less overrule it, as Ms. Golden is advocating for. But in an instance where 15 years down the line, 20 years down the line, if there are decisions that say, well, now courts have been applying this ordinary person framework articulated by Solomon, and now it seems like the general ability of the average person can decipher things like page long solid blocks of computer code, then the way that this court would address the issue presented by Solomon, which again is a binding precedental decision, which should guide the decision in this case and future cases, is by, again, considering whether to decide that, rehear Solomon en banc, or if a court was thought that the- Wait a minute. I'm sorry. I just, I want to make sure what you are asking us to find is if the ordinary person changes over time, we have to be bound by when the ordinary person was and the first time the court considered the issue? Is that what you're asking us to find? No. No, I'm not. I'm sorry if that was the takeaway. So the objective person standard is an, it's an objective test, right? It's an objective definitional test. And presumably dynamic, right? Because at least over, there could be reasons why an ordinary person might look different in 2005 versus 2050, right? Sure. Sure. I mean, times are changing very quickly, Your Honor, and certainly a court could have different opinions about what an ordinary person would understand about a given piece of information. But again, that's not the issue presented today. But if that issue were presented, I think the appropriate outcome would be to potentially note some tension between what Solomon provides and requires and the facts presented to a particular panel. And exactly as they circuited in the AJT case, they could say, we're bound by Biden precedent. Dismissal is warranted here, but we think there's some play in the joints if the Supreme Court wants to take up the issue, right? And so that provides the avenue that Ms. Golden is asking for here, the opportunity to petition the Supreme Court to rehear or to consider the ordinary person standard for the third time. Perhaps the Supreme Court will take that up. We don't think it will. This court is bound by Solomon and should affirm the decision below. Thank you. Thank you. Appreciate it. Attorney Hamlin. Thank you, Your Honors. I do want to mention one quick point. It's true that the Supreme Court has not announced these rules in the context of a VPPA case yet, but the Supreme Court has granted a VPPA case. Salazar versus Paramount Global, 25-259, I believe, or 459, I believe. The Supreme Court is going to have a VPPA case in its next term. Sorry. Salazar being who's a customer, that question? Consumer. Correct. Consumer.  Yes. And the briefing in that case, if you look at the petition and our brief that's going to be filed today, it talks extensively about atextualism and rules that prohibit atextual elements and requirements that go beyond the text. So I think it's quite likely that the Supreme Court is going to announce or is at least going to discuss atextualism and the rule against atextual tests in the context of this very statute within the next year or so. So I think if there's any lingering doubt about whether the rule prohibiting atextual tests applies in the VPPA, if there's lingering doubt, wait. Wait until Salazar gets out. Well, I guess part of the reason that I'm confused about some of this stuff is that the statute doesn't actually prohibit disclosure of information that in fact reveals a person's identity in video watching history. It's actually prohibiting personally identifiable information. So if the task in Solomon was to determine what personally identifiable information means, how does that really answer the question about whether or not it was atextual? I'm not sure I followed the question exactly, so forgive me if I step aside here. But the question in Solomon is what does PII mean? And it answered that question that PII means only what an ordinary person understands to link an individual to video watching history. That's very different than the definition Congress actually wrote in subsection A3. Congress wrote, without any exception, without any limitation, that PII includes information that identifies a person as having requested or obtained specific video materials or services from a VTSP. So on the one hand, we fit that definition perfectly. Everyone agrees, again, the district court, NBC, us, we all agree this information did exactly that. The only thing standing in Ms. Golden's way is the ordinary person limitation, which again goes back to our radical agreement. You heard my colleague on the other side say that Supreme Court precedent is clear. You can interpret a statute, judges can interpret statutes, but they can't add elements. They can't add requirements. What's the difference between adding elements and offering a reasonable argument for a different test?  What's the difference?  They clearly... I mean, the Solomon Court had the same statute that you have and that we have and that we're looking at and they decided they needed more. So are you actually... Why wouldn't another test also be a textual? People thought that it wasn't clear. So this goes back, well, let's start with one point about what Solomon did. Solomon does not look like an opinion engaging in statutory interpretation. It mentions zero canons of interpretation. It doesn't attempt to construe any particular word in the VPPA to compel an ordinary person test. It simply looks out at the definition of PII and says one circuit has adopted the reasonable foreseeability test. A different circuit has adopted the ordinary person test. Excuse me for just a second, though, just looking at Solomon, the section discussing the statutes is when interpreting statutory provision, we begin with the words of statute. If the words are clear, we construe it according to its plain meaning. If it's not, we may consider legislative history and the tools of statutory construction. He says plain meaning by reference to the specific language, the specific context. Why isn't it applying ordinary rules of statutory interpretation? It applies no canon of statutory interpretation. Because it doesn't use the Latin phrase, identifying a canon? No, because it doesn't use any canon. It doesn't use a canon to arrive at the ordinary person test. What's wrong with the statutory rules that I just read to you? Nothing is wrong with those rules. In fact, we agree with those rules wholeheartedly. But that's not the analysis Solomon deployed to arrive at the ordinary person test. It plainly did not apply the plain text meaning. It didn't apply ordinary meaning. It didn't apply any- Well, many of it, again, these are arguments you've made earlier and that have not been accepted and that we're not free to disagree on in Solomon, right? Thank you, Your Honor. Appreciate your arguments. Thank you both. We will take this under advisement.